**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL M.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | No. 19 C 4899 |
| ) | |
| **KILOLO KIJAKAZI,** ) | **Magistrate Judge Finnegan** |
| **Acting Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

Plaintiff Michael M. seeks to overturn the final decision of the Acting Commissioner of Social Security ("Commissioner"), denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA") and granting in part his application for Supplemental Security Income ("SSI") under Title XVI of the SSA. (Docs. 1, 6). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 8, 9). Plaintiff filed a brief arguing that the Commissioner's decision should be reversed or the case remanded, and the Commissioner filed a motion for summary judgment arguing that the decision should be affirmed. (Docs. 15, 24, 25). After careful review of the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings as outlined below. The Court therefore denies the Commissioner's motion and grants Plaintiff's request for remand.

---

[1] Acting Commissioner Kijakazi is substituted for her predecessor, Andrew M. Saul, pursuant to Fed. R. Civ. P. 25(d).

## **BACKGROUND**

Plaintiff applied for DIB on November 26, 2012, alleging disability since April 17, 2011 due to a herniated disc, a back injury, hip and neck pain, migraine headaches, and depression. (R. 73, 74, 84, 96, 185-93, 215-16, 219, 460). Born in 1969, Plaintiff was 42 years old on the application date (R. 74, 187, 591), and was at all relevant times a younger person (under age 50). 20 C.F.R. § 404.1563(c).[2] Plaintiff completed high school and two years of college, and he previously worked as a security guard from 2008 until the April 17, 2011 alleged onset date, when he was in a motor vehicle accident. (R. 219-20, 225, 477-78, 525-26, 546). Though Plaintiff attempted to return to work, he quit after a week due to his injuries and has not held significant employment since that time. (R. 41-42, 219, 225).[3]

The Social Security Administration denied Plaintiff's DIB application initially on February 7, 2013 and on reconsideration on August 27, 2013. (R. 73, 96-100, 103-05, 460). Plaintiff requested a hearing, which was held before Administrative Law Judge Karen Sayon ("ALJ Sayon") on June 4, 2015. By that time, Plaintiff had also filed an application for SSI benefits. (R. 174-76, 460). Plaintiff was represented by counsel at the hearing, and both he and a vocational expert testified. (R. 33-72, 107-08, 460). ALJ

---

[2] Because the regulations governing DIB and SSI are substantially identical, for convenience, only the DIB regulations are cited herein.

[3] Plaintiff's work history report indicates that, in the 15 years before he became unable to work (in 2011), he worked as: a dock supervisor for a parcel delivery service (July 1999 to July 2003); a security supervisor (July 2003 to August 2006); a delivery driver (September 2006 to sometime in 2009); and "security" at a skating rink (September 2009 to April 2011). (R. 225). His earnings records reflect no income after 2008. (R. 196-97). Plaintiff testified that he did "1099 work" as a security guard from 2008 to 2011 but did not recall how much he earned. (R. 526).

Sayon denied Plaintiff's DIB and SSI claims in a decision dated July 1, 2015, which the Appeals Council declined to review. (R. 1-7, 16-28, 460).

On judicial review, this Court reversed ALJ Sayon's decision and remanded the case for further administrative proceedings. (R. 460, 619-30). On remand, the Appeals Council vacated ALJ Sayon's decision; remanded the case for further proceedings; and consolidated Plaintiff's DIB and SSI applications with a second SSI application that Plaintiff had filed on February 17, 2017, alleging disability since July 2, 2015 due to "DDD" (degenerative disc disease) of the cervical and lumbar spine. (R. 460-61, 591-92, 604, 650-53).[4] Administrative Law Judge Laurie Wardell ("ALJ Wardell" or the "ALJ") held a new hearing on February 13, 2019 and heard testimony from Plaintiff, who was once again represented by counsel, and Vocational Expert ("VE") Tom Dunleavy. (R. 522-59).

On March 26, 2019, ALJ Wardell issued a partially favorable decision finding that Plaintiff was not disabled through the September 30, 2013 date last insured (R. 73, 74, 84, 96, 215, 460) for purposes of the DIB application, but was disabled as of January 1, 2015 based on the SSI application. (R. 460-80). ALJ Wardell found that Plaintiff's degenerative disc disease of the cervical and lumbar spine, obesity, and depression are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 463-68). The ALJ concluded that, prior to January 1, 2015, Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following limitations: occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally stooping and crouching; never kneeling or crawling; occasionally reaching overhead with both upper extremities; never pushing,

---

[4] The record does not include a copy of this application.

3

pulling, or operating hand controls with the right upper extremity; frequently reaching forward with the right upper extremity; never operating foot controls with the right lower extremity; tolerating occasional exposure to hazards and vibrations; being able to shift positions from sitting to standing, and vice versa, every 30 minutes for one to two minutes while remaining on task; and performing simple, routine, repetitive tasks that involve simple work-related decision-making and only occasional changes in the work setting. (R. 468-75). The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC could perform jobs that existed in significant numbers in the national economy, namely Assembler, Sorter, and Visual Inspector. (R. 478-79, 546-49). As a result, the ALJ found that Plaintiff was not disabled prior to January 1, 2015. (R. 479).

The ALJ determined that, beginning on January 1, 2015, Plaintiff retained the same RFC with the additional limitation of being off task for more than ten percent of the time in an eight-hour workday. (R. 475-77). The VE testified that allowable off-task behavior is not more than ten percent of the work time, meaning about six minutes an hour. (R. 555-57). Based on the VE's testimony, the ALJ found that Plaintiff is unable to perform any jobs at this RFC and therefore has been disabled since January 1, 2015. (R. 479).

Plaintiff appealed ALJ Wardell's decision directly to this Court. In support of his request for reversal or remand of the determination that he was not disabled prior to January 1, 2015, Plaintiff argues that the ALJ erred in: (1) including no restrictions in the RFC to accommodate his mental limitations in terms of interacting with others, concentrating, and adapting or managing himself; (2) determining the RFC as to occasionally reaching overhead with both arms, frequently reaching forward with the right arm, and shifting positions between sitting and standing every 30 minutes for one to two

minutes while remaining on task despite his physical impairments; and (3) assessing the subjective symptom allegations. For reasons discussed below, the Court finds that the case must be remanded for further consideration of the sit/stand limitation.

## DISCUSSION

### I. Governing Standards

#### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and

5

quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

II.      Analysis

    A.      Sit/Stand Limitation

Plaintiff argues that the case must be reversed or remanded because the ALJ did not explain the determination that, prior to the January 1, 2015 established onset date, he retained the RFC to shift positions from sitting to standing, and vice versa, every 30 minutes for one to two minutes throughout an eight-hour workday while remaining on task. (R. 468, 472). A claimant's RFC is the maximum work that he can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

        1.  Medical Evidence

On April 19, 2011, Plaintiff visited the emergency room and reported shoulder, neck, and back pain following a car accident two days earlier. (R. 341-51, 469). He was prescribed Motrin and Flexeril. (R. 345, 469). On April 26, 2011, Plaintiff also saw a chiropractor for shoulder, neck, and back pain following the accident. (R. 305-15). At that time, Plaintiff had no insurance. (R. 305). He complained of difficulty sitting, standing, walking, and bending. (R. 305). Plaintiff then received regular chiropractic treatment from late April to mid August 2011. (R. 316-23, 328-29, 334-36, 369-73, 469).[5]

---

[5]    The ALJ wrote that, while chiropractors noted Plaintiff's complaints of pain from the accident, they generally observed appropriate or slightly diminished range of motion and neurologic functioning in his back and extremities. (R. 316-26, 469). The records are handwritten and difficult to interpret, but Plaintiff does not dispute this characterization.

An x-ray of the lumbar spine on April 26, 2011 showed discogenic spondylosis at L4/L5 and facet arthrosis of the lower lumbar spine; noted postural comments and biomechanical alterations; and indicated no other gross evidence of bone or joint pathology. (R. 330, 469). An x-ray of the cervical spine the same day showed moderate degenerative disc disease at C4/C5 and mild at C5/C6 with some superimposed "DISH" (diffuse idiopathic skeletal hyperostosis), uncovertebral arthrosis on the left at C3/C4 and bilaterally at C4/C5 with bony "IVF" (or foraminal) encroachment, and facet arthrosis at C7/T1; noted postural comments and biomechanical alterations; and indicated no other gross evidence of bone or joint pathology. (R. 330-31, 469).[6] An MRI of the lumbar spine on June 27, 2011 revealed broad-based central protrusion at L4/L5 with intervertebral osteochondrosis. (R. 327, 332, 469).

The record includes no medical records from August 2011 to January 2013. (R. 469). On January 15, 2013, Plaintiff saw Valerie Voss, M.D. for a consultative examination in connection with his DIB application. (R. 392-99, 469-70, 472). Plaintiff reported that, since the April 2011 car accident, he experienced pain from a herniated disc, migraine headaches twice a month lasting several days, hip pain that was improving, neck pain three times a week, and depression. (R. 392, 469).

Dr. Voss observed that Plaintiff: ambulated with a slow but steady gait and without assistive devices; could tandem walk, walk on heels, dress and undress, rise from a chair, and get on and off the exam table; and could not hop. (R. 394, 469). Straight leg testing in sitting and supine positions was negative bilaterally; and Plaintiff had 5/5 upper and

---

[6] DISH is "a bony hardening of ligaments in areas where they attach to [the] spine." https://www.mayoclinic.org/diseases-conditions/diffuse-idiopathic-skeletal-hyperostosis/symptoms-causes/syc-20371661, last visited on August 11, 2021.

lower extremity strength, 5/5 hand grip strength, and normal hand and finger grasp. (R. 394, 470). Range of motion findings were as follows: within normal limits in Plaintiff's cervical spine, lumbar spine, and ankles; normal in his elbows, wrists, and knees; diminished in his shoulders in terms of flexion, extension, and abduction, but not adduction or rotation; and diminished in his hips as to flexion, extension, abduction, and rotation, but not adduction. (R. 398-99, 469-70). Regarding obesity, Dr. Voss noted that Plaintiff had a BMI of 38.7 "without ambulatory, respiratory, or mobility limitations." (R. 395, 471).

Dr. Voss diagnosed a herniated disc/back injury, neck pain, hip pain, migraines without aura, and depression. (R. 395, 470, 474). Dr. Voss stated that Plaintiff experienced severe back pain, moderate neck pain, improved hip pain, frequent migraines, and depression due to physical limitations from chronic pain and injuries. (R. 395, 474). Dr. Voss provided a medical source statement that Plaintiff was "significantly limited in his ability to sit or stand for prolonged periods of time" due to the back injury, could walk without assistive devices but not for long distances, and was able to carry objects of "minimal weight." (R. 395, 474).

On July 13, 2013, Charles Carlton, M.D. performed another internal medicine consultative examination. (R. 400-08, 470, 472). Plaintiff reported developing low back, neck, leg, hip, and headache pain after the April 2011 car accident. (R. 400, 470). Dr. Carlton noted that Plaintiff: was obese; had a slow and slightly rigid gait and reported pain while walking, but was able to walk greater than 50 feet without an assistive device; could rise from sitting to standing without assistance; had no difficulty getting on and off the exam table; and described significant pain and made no attempt to walk on toes and

9

heels, squat, or tandem walk. (R. 401, 404, 470). He displayed normal grip strength as well as normal fine and gross motor skills. (R. 402-03, 405).

Dr. Carlton observed full painless range of motion in all joints except for Plaintiff's shoulders, hips, and knees, as well as some decreased range of motion of his lumbar spine. (R. 402, 405-07, 470). But Dr. Carlton noted "some inconsistencies" during range of motion and manual muscle testing as follows. (R. 402, 470). Though Plaintiff reported an inability to actively abduct and flex his shoulders greater than 20 degrees while seated on the exam table, he actively abducted his right shoulder greater than 90 degrees to place it on a counter when rising from sitting to standing. (R. 402, 470). And while Plaintiff displayed an inability to actively flex his hips greater than 30 degrees and his knees greater than 20 degrees while lying supine on the exam table, he sat in a low chair with his hips flexed greater than 95 degrees and his knees flexed greater than 120 degrees and did not appear to be in any discomfort. (R. 402, 470).

Dr. Carlton diagnosed "[r]eports" of: chronic neck, back, leg, and hip pain; right leg numbness; degenerative disc disease of the lumbar spine; chronic headaches; limited tolerance for standing and walking; and episodes of depression. (R. 403, 470). Dr. Carlton provided a medical source statement that he "believe[d]" Plaintiff could: safely sit and stand; walk greater than 50 feet without an assistive device; handle objects using both hands; lift greater than 20 pounds; and hear and speak. (R. 403-04, 473-74). This was the doctor's "conservative estimate" of Plaintiff's functional abilities. (R. 404, 474).

On August 8, 2013 Ericka Swanson, Psy.D. conducted a consultative mental status evaluation. (R. 410-13, 466-67, 470-73). Plaintiff told Dr. Swanson about his back and neck injuries from the April 2011 car accident. (R. 410). He complained of right leg

numbness and pain; hip, neck, shoulder, arm, and hand pain; and headaches. (R. 410-11, 470). Plaintiff also described difficulty coping with his physical impairments. (*Id.*). Plaintiff reported that he "went to [the] doctor for a little with the car insurance" and then to the emergency room "when he ran out of car insurance" and also "did physical therapy for a few months but the insurance ran out." (R. 410). Plaintiff said that he took no prescription medication due to lack of medical insurance. (R. 411). He also told Dr. Swanson that about six months earlier he had worked out a lot, but since then had no appetite and had lost 30 pounds. (R. 411, 467, 470). Plaintiff stated that he was limited in terms of lifting, sitting, walking, and cleaning the house. (R. 411, 470-71).

The record next documents treatment in December 2014. (R. 471). On December 23, 2014, Plaintiff visited Aunt Martha's Health Center for back pain and hypertension. (R. 436-38, 471, 473). Plaintiff's primary care provider instructed him to take medication (including Naproxen), apply ice, and use Icy Hot rub for back pain; ordered a lumbar spine x-ray; and recommended increased activity and diet changes for hypertension. (R. 436-38, 471). This is the last medical record before the January 1, 2015 established onset date. (R. 471).

### 2. RFC Finding

In formulating the RFC for the period before January 1, 2015, the ALJ determined that "based on the combined effect of [Plaintiff's] musculoskeletal impairments," he "required the ability to shift positions from sitting to standing and vice versa every 30 minutes for one-to-two minutes each time while remaining on task." (R. 472). As noted, the RFC determination as of January 1, 2015 maintained this same sit/stand limitation (and all other limitations) but added that Plaintiff would be off task for more than ten

11

percent of the time in an eight-hour workday. (R. 475). The ALJ discounted the opinions of state agency reviewing physicians Julio Pardo, M.D. on February 4, 2013 and Reynaldo Gotanco, M.D. on August 26, 2013 that Plaintiff was capable of performing light work, and Vidya Madala, M.D. on August 29, 2017 and Michael Nenaber, M.D. on October 25, 2017 that he could do medium work, because the doctors gave "no consideration" to his "need to alternate between sitting and standing positions[.]" (R. 474, citing R. 79-81, 91-93, 599-600, 613-15). The ALJ added that, not only did the state agency reviewing physicians not examine Plaintiff, but they "did not adequately address [his] subjective recounts of his symptoms." (R. 474).

The ALJ's discussion of Plaintiff's subjective statements about his symptoms noted his claimed inability to "stand or sit for extended periods before needing to switch positions" based on his testimony at the February 2019 hearing as well as his function reports dated January 6, 2013 and June 27, 2017. (R. 468-69, citing R. 254-64, 797-807).[7] While the ALJ did not elaborate, Plaintiff stated in the June 2017 function report that it was "impossible to sit or stand for 30 mins. at a time without pain and discomfort[,]" the pain would become too severe, and he would "start losing focus." (R. 797, 802). He similarly testified, both at the June 2015 and February 2019 hearings, that he could sit and stand for about 30 minutes each. (R. 52-53, 530-31, 539-41). In this respect, the RFC finding that Plaintiff could shift between sitting and standing every 30 minutes is consistent with his claimed degree of limitation.

---

7     The ALJ also cited Plaintiff's hearing and review briefs dated June 3, 2015 and September 4, 2015, respectively. (R. 468, citing R. 286-291, 296-300).

However, as Plaintiff notes (*see* Doc. 15, at 11-12; Doc. 26, at 12), the ALJ did not discuss other inconsistent evidence reflecting greater restriction in terms of his ability to shift between sitting and standing. Specifically, Plaintiff testified (at both hearings) that he could alternate sitting and standing for no more than an hour and a half or a couple of hours. (R. 62-63, 539-41). The Commissioner does not respond with any defense of the ALJ not having resolved this inconsistency as to the extent of Plaintiff's ability to switch positions in formulating the sit/stand limitation. Plaintiff also testified that he could only get relief from the pain by lying down and spent most of the day in a recliner chair. (R. 58, 62-63, 539-41). The ALJ likewise did not address this contrary testimony. While the ALJ need not discuss "every piece of testimony and evidence[,]" *Pepper*, 712 F.3d at 362, she must build an "accurate and logical bridge" to the RFC finding that Plaintiff could alternate sitting and standing every 30 minutes throughout the workday. *See Simila*, 573 F.3d at 513.

Notably, the ALJ generally attributed the determination that before (and after) January 1, 2015 Plaintiff could continually switch between sitting and standing to his physical impairments, yet identified no particular supporting evidence for this limitation apart from Plaintiff's subjective statements. (R. 468-69, 472, 474-75). While the ALJ apparently accepted Plaintiff's claims that he could sit and stand for only 30 minutes each as a result of his physical problems, she made no mention of testimony that did not support the sit/stand limitation, namely that he could not sustain shifting positions like that for more than a few hours and would need to lie down to relieve the pain. On this record, the Court cannot discern whether the ALJ considered and rejected—or overlooked— Plaintiff's claimed degree of limitation in terms of alternating sitting and standing. *See*

13

*Williams v. Berryhill*, No. 16 C 3807, 2017 WL 3130763, at *8-9 (N.D. Ill. July 24, 2017) (remanding where ALJ did not discuss medical and testimonial evidence relied on to formulate sit-stand option to alternate positions every 30 minutes for one to two minutes at a time, and court did not know whether ALJ considered plaintiff's alleged difficulty sitting for 20 minutes); *see also See Tonya S. L. v. Saul*, No. 20 C 3888, 2021 WL 1209015, at *2 (N.D. Ill. Mar. 31, 2021) (remanding where ALJ cited plaintiff's testimony that she needed to walk around for five to seven minutes after sitting for an hour to support limitation to shift positions or alternate between sitting and standing every 30 minutes for one to two minutes at a time while remaining on task, but ALJ cited no evidence "for reducing by half the time plaintiff said she needed to stand each hour or asserting that plaintiff could remain on task while standing.").

Moreover, as Plaintiff notes (*see* Doc. 15, at 11; Doc. 26, at 12), the ALJ did not explain how the record supports the finding that he could remain on task while changing positions. The Commissioner does not dispute this, stating that "there was nothing to explain." (Doc. 25, at 6). But the lack of explanation as to why the ALJ concluded that Plaintiff could remain on task while switching positions and needed no more than two minutes to do so is problematic because the disability determination in this case hinged on whether Plaintiff was able to stay sufficiently on task given his physical impairments. (R. 475-77, 479, 555-57). Specifically, the ALJ concluded that, as of January 1, 2015, the medical evidence "support[ed] a finding that . . . [Plaintiff's] pain as well as the severity of his musculoskeletal conditions increased significantly" but, as noted, reached the same RFC finding as to all functional limitations (including shifting positions between sitting and standing every 30 minutes for one to two minutes while remaining on task) except that he

14

would be off task for more than ten percent of the time in an eight-hour workday. (R. 476).

The Commissioner's reliance on *Prater v. Saul*, 947 F.3d 479 (7th Cir. 2020), to excuse the decision's silence on this point is unavailing. In *Prater*, the Seventh Circuit concluded that a sit/stand limitation requiring "the ability to change positions as needed, while remaining in each position at least 30 minutes" was not impermissibly vague. 947 F.3d at 481-82 (rejecting argument that it was unclear whether plaintiff could alternate positions at will or only every 30 minutes and finding that she could choose when to change positions with 30 minutes serving as "outer limit" to avoid being off task too frequently). Here, the issue is not that the sit/stand limitation is vague, but that the basis (if any) for the on-task component was not articulated. Absent any explanation, the Court does not know how the ALJ arrived at this determination.

For all of the foregoing reasons, this case is remanded for further proceedings consistent with this opinion to reconsider the sit/stand limitation.

## B. Remaining Arguments

The Court does not find any specific error with respect to Plaintiff's remaining arguments, but on remand the ALJ should: address Plaintiff's physical and mental impairments; and assess the subjective symptom allegations.

## CONCLUSION

For the reasons stated above, Plaintiff's request for remand (Doc. 15) is granted, and the Commissioner's motion for summary judgment (Doc. 24) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

15

ENTER:

Dated: August 11, 2021

*[signature]*
SHEILA FINNEGAN
United States Magistrate Judge